**GREENE COUNTY PLANNING BOARD, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Power Authority of the State of New York, Intervenor.**

**No. 137, Docket 74–2638.**

United States Court of Appeals, Second Circuit.

Argued Oct. 1, 1975.

Decided Dec. 22, 1975.

Robert J. Kafin, Glens Falls, N. Y. (Neil E. Needleman, Kafin & Needleman, Glens Falls, N. Y., of counsel), for petitioner.

Philip R. Telleen, Atty., Federal Power Commission (Drexel D. Journey, Gen. Counsel, Federal Power Commission, John R. Staffier, Atty., Federal Power Commission, of counsel), for respondent.

Scott B. Lilly, New York City (Morgan, Lewis & Bockius, Washington, D. C., of counsel), for intervenor.

Before WATERMAN, OAKES and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

This is a petition by Greene County Planning Board (the Planning Board), a municipal body which has been in this court previously in connection with transmission lines,[1] to review a final order and Permit of the Federal Power Commission (FPC), both issued on September 13, 1974, permitting the construction of a 765,000 volt (765 kv) facility by the Power Authority of the State of New York (PASNY). The construction project approved by the Commission is for the bulk transmission of electric energy at the United States-Canadian boundary in the town of Fort Covington, Franklin County, New York. The project consists of a single circuit tower with supporting structure, land and facilities, which is to be connected with a similar circuit suspended from a similar tower on the Canadian side of the border. The purpose of the connection is to allow PASNY to import Canadian electric power to help meet New York demands.[2] The FPC denied a petition for rehearing on October 25, 1974. The petition to review was then brought pursuant to § 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b),[3] and the Ad-

---

1. *See Greene County Planning Board v. FPC*, 455 F.2d 412 (2d Cir.), *cert denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Greene County Planning Board v. FPC*, 490 F.2d 256 (2d Cir. 1973).

2. The Agreement basically provides for the sale by Hydro-Quebec to PASNY of 800 MW of electric power and 2.14 billion kilowatt hours of energy in June-October of 1977 and 800 MW of power and 3 billion kwh of energy in April-October from 1977–1996. Under the agreement, PASNY also undertakes to sell energy during the winter months to Hydro-Quebec, under certain conditions.

3. Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), provides in pertinent part:

Any party to a proceeding under this [Act] aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. . . . No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the

ministrative Procedure Act, 5 U.S.C. §§ 701–06.

The Planning Board has petitioned this court to reverse the order and revoke the permit issued by the FPC. The Board requests that we order the FPC to comply with NEPA and the Federal Power Act by conducting interdisciplinary consideration of all relevant environmental factors before issuing this construction permit. The respondent FPC argues that we do not have jurisdiction over this petition under the Federal Power Act. The Commission argues that its actions in this case were not "under" the Federal Power Act, but rather were pursuant to § 7(d) of the Energy Supply and Environmental Coordination Act of 1974 (ESECA), 15 U.S.C. § 793(d),[4] and the provisions of Executive Order No. 10485, 3 C.F.R. 970 (1949–53 Comp.), dated September 3, 1953.[5] The Commission's position is that there is no statutory provision for review of actions taken under ESECA and Executive Order No. 10485, and, therefore, that we lack jurisdiction over the matters raised in the petition. PASNY makes the same arguments as does the FPC but also argues, first, that the petition for review must be dismissed for lack of standing because the Planning Board alleges no injury in fact from the issuance of the permit and, second, that the petition for review presents a non-justiciable political question, viz., whether the permit was issued in accordance with the proper conduct of the foreign relations of the United States.

We agree with the petitioner that it has standing to bring this petition for review. We agree with the FPC, however, that there is no jurisdiction under the Federal Power Act for us to review the order or permit issued by the Commission in this case. Lacking jurisdiction, we need not reach the political question point raised by PASNY. We accordingly deny the petition.

Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.

4. 15 U.S.C. § 793(d) provides:

In order to expedite the prompt construction of facilities for the importation of hydroelectric energy thereby helping to reduce the shortage of petroleum products in the United States, the Federal Power Commission is hereby authorized and directed to issue a Presidential permit pursuant to Executive Order 10485 of September 3, 1953, for the construction, operation, maintenance, and connection of facilities for the transmission of electric energy at the borders of the United States without preparing an environmental impact statement pursuant to section 102 of the National Environmental Policy Act of 1969 (83 Stat. 856) for facilities for the transmission of electric energy between Canada and the United States in the vicinity of Fort Covington, New York.

5. Executive Order No. 10485 [3 C.F.R. 970 (1949–53 Comp.)] provides in pertinent part:

WHEREAS section 202(e) of the Federal Power Act, as amended, 49 Stat. 847 (16 U.S.C. 824a(e)), requires any person desiring to transmit any electric energy from the United States to a foreign country to obtain an order of the Federal Power Commission authorizing it to do so;

SECTION 1. (a) The Federal Power Commission is hereby designated and empowered to perform the following-described functions:

(1) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country.

(3) Upon finding the issuance of the permit to be consistent with the public interest, and, after obtaining the favorable recommendations of the Secretary of State and the Secretary of Defense thereon, to issue to the applicant, as appropriate, a permit for such construction, operation, maintenance, or connection. The Commission shall have the power to attach to the issuance of the permit and to the exercise of the rights granted thereunder such conditions as the public interest may in its judgment require.

SEC. 5. Executive Order No. 8202 of July 13, 1939, is hereby revoked.

DWIGHT D. EISENHOWER,
The White House
September 3, 1953.

## I. PROCEEDINGS BELOW

PASNY applied to the Commission on September 21, 1973, for authority to construct and operate the international connection facility at Fort Covington, Franklin County, New York. Since the application involved an international connection, PASNY requested that a Presidential Permit be issued to it pursuant to Executive Order No. 10485. The Greene County Planning Board filed a petition to intervene on October 16, 1973, claiming that the international connection was part of a "comprehensive integrated plan"—a plan which includes the Blenheim-Gilboa and Breakabeen hydroelectric projects (Commission Project Nos. 2685 & 2729) as well as other generating and transmission facilities in and about Greene County—and that this wider plan ultimately will harm the environment of Greene County. The Planning Board sought a consolidated consideration of the instant proceedings with the proceedings involving the Blenheim-Gilboa and Breakabeen projects.[6] The contentions of the Planning Board are based on the view that the ultrahigh voltage transmission facilities here under consideration will make vast amounts of Canadian hydroelectric power available at the New York state border and that power will necessarily be transmitted eventually through Greene County. This, they argue, will require the construction of immense transmission lines in Greene County. The Planning Board points out, and PASNY concedes, that the power will be transmitted south via Massena to Marcy, near Edic, New York, in the vicinity of Utica, by way of a 765 kv line which PASNY has proposed to construct. (An application for construction of that line is now pending before the New York State Public Service Commission.[7]) The Planning Board suggests that the power would then be transmitted to Gilboa, where PASNY has already constructed, under an FPC license, the one million watt Blenheim-Gilboa pump storage hydroelectric project and has evidently applied to the FPC for authorization to build another. The Planning Board then suggests that a 765 kv transmission line would enter Greene County from Gilboa and travel eastward across Greene County for some 35 miles to Leeds. Authorization for this transmission corridor across the county is sub judice before the FPC at this time, after twice having been involved in litigation in this court. See note 1, supra.[8] From Leeds, the Planning Board contends that the 765 kv transmission line would leave Greene County, cross the Hudson River and turn south to Pleasant Valley and eventually connect to New York.[9] PAS-

---

6. Blenheim-Gilboa has been licensed by the Commission and the pump storage project, but not the approved transmission lines, built. Breakabeen is pending.

7. Application of PASNY, N.Y.S. P.S.C. Case No. 26529.

   Section 2.3 of the agreement between PASNY and Hydro-Quebec refers expressly to "60 hertz alternating current" transmission facilities from Massena "to a point of major connection with [PASNY's] own system near Utica, N. Y."

8. The current proposal is only for a 345 kv line from Gilboa to Leeds, but such a line would evidently be upgradeable to 765 kv.

9. The Planning Board has attached to its brief a diagram which it claims is derived from Appendix C to the FPC Final Environmental Statement in FPC Project No. 2685 (Gilboa-Leeds) and the New York Power Pool 1974–1989 Plan filed by PASNY with the FPC on May 3, 1974. This diagram shows a 765 kv line crossing Greene County from Gilboa to Leeds. PASNY suggested at argument, however, that any 765 kv transmission would logically run over an existing 765 kv line from New Scotland in Albany County to Leeds (which, however, is in Greene County), barely touching and not crossing Greene County. Appended hereto as Appendix A is the Planning Board's diagram with PASNY's New Scotland line shown. We need not resolve the parties' views on this matter since it is a scientific fact, conceded by PASNY at argument, that electrical energy flows through a system in a unitary fashion and "will flow to some degree over the line from Gilboa to Leeds." See also Scenic Hudson Preservation Conference v. FPC, 453 F.2d 463, 489 n. 20 (2d Cir. 1971) (Oakes, J., dissenting), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed. 2d 813 (1972). There is no real dispute that the power from Canada is intended to be transferred to New York City.

NY contends that the Planning Board's contentions are merely speculative, and that a transmission line across Greene County might never be constructed since it is only one of several possible methods of "strengthening the statewide interconnecting transmission system in that area of the state."

While the Commission was considering PASNY's application and the petition to intervene, which included a request for an environmental impact study under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, Congress enacted ESECA, § 7(d) of which specifically related to the border crossing facilities here at issue. It provides that the Commission is

> authorized and directed to issue a Presidential permit pursuant to Executive Order 10485 . . . for the construction . . . of facilities for the transmission of electrical energy at the borders of the United States without preparing an environmental impact statement pursuant to [42 U.S.C. § 4332] for facilities for the transmission of electric energy between Canada and the United States in the vicinity of Fort Covington, New York.

15 U.S.C. § 793(d).[10] Accordingly, the Commission, in its authorization of this project, was proceeding solely under Executive Order No. 10485 and not under the terms of the Federal Power Act.

Pursuant to the requirements of the Executive Order the Commission obtained recommendations of the Secretary of State and the Secretary of Defense pertaining to the proposed connection at Fort Covington and the contract between PASNY and Hydro-Quebec, the Canadian authority.[11] On September 13, 1974, the FPC issued an order granting intervention for the Planning Board but denying its request for a hearing and for consolidation of the Fort Covington connection into the other proceedings affecting Greene County. It found that petitioner's participation "may be in the public interest" and therefore granted the petitions to intervene but held that pursuant to ESECA the requests for a hearing and environmental impact statement and a consolidation of proceedings should be denied. It forthwith issued the Permit accompanied with a finding that it was in the public interest,[12] as required by the Executive Order.

The Commission subsequently issued an order denying a rehearing on October 25, 1974, which indicated the Commission's belief that Congress intended all of the provisions of NEPA to be inapplicable to the Fort Covington action. The Commission rejected the contention that the Fort Covington application was subject to the provisions of the Federal Power Act either as a "project" within the meaning of § 3(11) of the Act, 16 U.S.C. § 796(11),[13] or as part of a "comprehensive plan" within the meaning of

---

10. *See* note 4 *supra.*

11. The Department of State's letter of August 22, 1974, "supports" the issuance of the permit. The Department of Defense letter of August 15, 1974, advises the FPC that the Department "is not aware of any existing reason to withhold approval of the request . . . ."

12. Conditions were attached to the Permit including inspection by the Corps of Engineers and a Commission representative, liability to third parties, non-assignability, removal of facilities upon termination of the Permit and United States possession for safety purposes.

13. Section 3(11) of the Federal Power Act, 16 U.S.C. § 796(11), defines "project" as follows:

> "[P]roject" means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith, the primary line or lines transmitting power therefrom to the point of junction with the distribution system or with the interconnected primary transmission system, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit.

§ 10(a) of the Act, 16 U.S.C. § 803(a).[14] It claimed that its licensing jurisdiction under Part One of the Act does not extend either to the border facilities or to related facilities which are part of the border connection project. Beyond this the Commission denied a public hearing on the basis that § 7(d) of ESECA clearly indicated a sense of urgency. The Commission stated that it had considered the petitioner's objections, but concluded that an evidentiary hearing was not necessary or appropriate, pointing out that the petitioner represents interests in a county some 180 miles south of the border crossing point, and that no resident or public official or agency of Franklin County where the facilities in question are to be located had raised any objection. Thereafter the Planning Board filed this petition for review.

## II. STANDING

■ PASNY relies on *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), for its argument that petitioners lack standing in this case. It contends that because the facilities here in question are located miles from Greene County the Planning Board cannot show any injury-in-fact from the granting of the Fort Covington Permit. PASNY points out that even if the remainder of the line connecting these facilities with midstate New York is built to Utica (or Edic) it will still be 72 miles from Greene County. Our own *Greene County Planning Board v. FPC*, 455 F.2d 412 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972) (*Greene County I*), and *Greene County Planning Board v. FPC*, 490 F.2d 256 (2d Cir. 1973)

(*Greene County II*), involved proposed 765 kv transmission lines crossing Greene County from Gilboa to Leeds. The Planning Board urges that a connecting facility from Edic to Gilboa will have vast consequences on the proposed transmission corridor and the environment of Greene County. In *Greene County I* this court stated that the FPC could not "disregard impending plans for further power development" and that the court could not "tolerate the Commission cutting back on its expanded responsibility by binding itself to potential developments . . . ." 455 F.2d at 424. As Judge Mansfield also commented in dissent in *Greene County II*, "[o]ur earlier opinion scored the FPC for its failure to consider impending plans for further power development when it was analyzing a project likely to be influenced by such future development." 490 F.2d at 261. These opinions indicate that it may well be artificial to separate portions of an integrated plan and allow only those persons physically located near each segment of the plan to challenge that particular portion of the unified scheme. When we are considering a unified transmission plan, those affected adversely by any particular portion may well be injured by approval of another portion of the plan by way of commitment of resources or otherwise, at least where the approved segment as here has no independent utility.

PASNY concedes that, at the very least, it will construct a 765 kv line to its proposed Massena substation and from there to a proposed substation at Marcy. The Marcy substation will be adjacent and connected to the Niagara-Mohawk Power Corporation Edic substation in

---

14. Section 10(a) of the Federal Power Act, 16 U.S.C. § 803, provides:

All licenses issued under this Part shall be on the following conditions:

(a) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval.

the vicinity of Utica. "From that point the power will be transmitted over existing lines to load centers throughout the interconnected system including lines to the Consolidated Edison Company system facilities at Pleasant Valley and from there on its lines to New York City." Intervenor's brief at 7. PASNY also concedes that the initial decision on the Gilboa-Leeds line provided that the line as constructed should be able to be upgraded to 765 kv. PASNY is already seeking FPC approval for immediate construction of a 345 kv line from Gilboa to Leeds and for a second 345 kv line from Breakabeen to Leeds. It is further conceded as it has to be that to some degree power from Canada will flow over an interconnected circuit system which includes these two 345 kv lines. *See* note 9 *supra.* Thus, at the very least, PASNY admits that a 765 kv line from Marcy-Edic to Gilboa and through Greene County "is one of several possible alternatives that would be available if there arose a need to strengthen the proposed 765 kv statewide transmission system." They merely state that this will not be needed, if at all, until the 1980s.[15]

In an area where long-range planning is essential, *see* Cook, *The Flow of Energy in an Industrial Society*, Scientific American (Sept. 1971) 135, 144, it would border on the absurd to assert that a statutorily constituted county planning agency,[16] in a county which has a real probability of being affected by transmission corridors in the future, would lack standing to raise the claim that is here made. The original petition to intervene argues that additional transmission corridors and lines in the county will be inconsistent with the historic, social and economic and cultural qualities of Greene County, and will cause environ-

mental damage therein. It also objects that a piecemeal approach is employed by PASNY and the Commission which will deprive concerned parties of the opportunity for an overall evaluation. *Cf. Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927, 934–35 (2d Cir. 1974), *vacated and remanded*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975) (in light of Pub.L. No. 94–83 and *Aberdeen & Rockfish Railroad v. SCRAP*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975)); *Scientists' Institute for Public Information, Inc. v. AEC*, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1085–92 (1973). While it may be true that any number of other persons who live in assorted other areas of New York State could claim standing similar to those of Greene County, the Supreme Court has made it clear that standing is not to be denied because many people suffer the same injury. *United States v. SCRAP*, 412 U.S. 669, 686–87, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *Id.* at 688, 93 S.Ct. at 2416. *See also id.* at 689 n. 14, 93 S.Ct. 2405. The Greene County Planning Board is surely as greatly aggrieved as the Scenic Hudson Preservation Conference was in the original Storm King case, even though the threat here is one somewhat further in the future.[17] *See Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608, 616 (2d Cir. 1965) (injury to aesthetic, conservational and recreational interests alleged), *cert. denied, Consolidated Edison Co. of New York v. Scenic Hudson Preservation Conference*, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); *Wilderness Society*

15. *But see* note 9, *supra.*

16. N. Y. General Municipal Law § 239–b (McKinney 1974). The Planning Board was established March 15, 1968, by the Greene County Legislature.

17. It has recently been suggested that certain adverse environmental effects are likely to result from the enormous electrical currents passing through ultrahigh voltage lines. *See* N. Y. Times, Nov. 10, 1975, at 1, col. 6. Land condemnation is another principal concern of the Planning Board.

*v. Morton,* 150 U.S.App.D.C. 170, 463 F.2d 1261 (1972). We reject the argument that petitioner lacks standing to challenge the Commission's action in this case.

## III. APPLICABILITY OF THE FEDERAL POWER ACT

Part One of the Federal Power Act § 3(11), 16 U.S.C. § 796(11), note 13 *supra,* defines a hydroelectric project, and § 4(e), 16 U.S.C. § 797(e), confers jurisdiction on the Commission to license such projects. Petitioner claims that the Fort Covington permit awarded by the Commission was a portion of such a project, and that the award was therefore made "under" the Federal Power Act. Orders made by the Commission "under" the Federal Power Act are reviewable in the courts of appeals. 16 U.S.C. §§ 825*l*(a), (b).

The only way in which jurisdiction could obtain here would be if the transmission line facilities at issue were "the primary line or lines transmitting power [from the hydroelectric project] to the point of junction with the distribution system or with the interconnected primary transmission system . . . ." 16 U.S.C. § 796(11), note 13 *supra.* However, there is no hydroelectric project within the Commission's jurisdiction which is involved here (the Canadian generating facilities are not subject to FPC licensing), and hence the border crossing facility cannot conceivably be a "primary line" for such a project.

Petitioner also claims we have jurisdiction to review the Commission's order as a component of a "comprehensive plan." Section 10(a) of the Act, 16 U.S.C. § 803(a), note 14 *supra,* does impose upon the Commission a duty to develop a "comprehensive plan," but this duty arises only in connection with projects over which it has licensing jurisdiction. The condition of conformance to a comprehensive plan relates only to "[a]ll licenses issued under this Part . . . ." *See* note 14 *supra.* However much we might agree with the petitioner that there may be great need for a single regulatory body having planning responsibility over various aspects of electric generation and transmission, the FPC does not have such responsibility·in this situation, *see FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 635–36, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), for it is clear that these facilities are not subject to Commission regulations under the provisions of Part One of the Act. The argument advanced by petitioner is one for Congress, not the courts.

■ Nor is Part Two of the Federal Power Act here involved. The Planning Board argues that the power contract between PASNY and Hydro-Quebec provides for the possible *exportation* of power by PASNY,[18] and that PASNY is therefore required by § 202(e) of the Act, 16 U.S.C. § 824a(e), to obtain formal FPC authorization for the contract.[19] This argument was, however, not made in the application for rehearing. Therefore we have no jurisdiction to entertain it for the first time here. 16 U.S.C. § 825*l*(b); *FPC v. Colorado Interstate*

**18.** *See* note 2 *supra.*

**19.** Section 202(e) of the Federal Power Act, 16 U.S.C. § 824a(e), provides:

After six months from the date on which this Part takes effect, no person shall transmit any electric energy from the United States to a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application unless, after opportunity for hearing, it finds that the proposed transmission would impair the sufficiency of electric supply within the United States or would impede or tend to impede the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may by its order grant such application in whole or in part, with such modifications and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate.

*Gas Co.,* 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583 (1955); *Rhode Island Consumers Council v. FPC,* 164 U.S.App.D.C. 134, 504 F.2d 203 (1974). Even if we did have jurisdiction over this claim, we would have to reckon with the Commission's administrative determination that for purposes of the exportation control authority under § 202(e) of the Act, state agencies such as PASNY which fall within the definition of municipalities in § 3(7) of the Act, 16 U.S.C. § 796(7),[20] are not required to obtain export authorizations under § 202(e). *See Lubeck (Maine) Water and Electric District Permit,* FPC Docket No. E7527 (Aug. 21, 1970).

It is, to the contrary, clear that Executive Order No. 10485, note 5 *supra,* delegates an executive function to the FPC, a function rooted in the President's power with respect to foreign relations if not as Commander in Chief of the Armed Forces. Its predecessor, Executive Order No. 8202, 3 C.F.R. 560 (1938–43 Comp.), issued July 13, 1939, had called for the Commission to receive permit applications but then only to make recommendations to the President. The President retained power to grant permits and to impose conditions thereon. *See generally United States v. La Compagnie Francaise des Cables Telegraphiques,* 77 F. 495 (S.D.N.Y.1896); 30 Op.Att'y Gen. 217 (Aug. 14, 1913); 22 Op.Att'y Gen. 13, 25, 26, 27 (Jan. 1898). While Executive Order No. 10485 refers to § 202(e) of the Federal Power Act in its preamble, it does so simply to explain *why* the President delegated the duty to issue international connection permits. The preamble does not suggest that the Act is the basis for Executive Order No. 10485.

**20.** Section 3(7) of the Federal Power Act, 16 U.S.C. § 796(7), provides:

"[M]unicipality" means a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power.

**21.** Petitioner has, of course, raised the objection that the FPC order fails to comply with the provisions of NEPA, 42 U.S.C. § 4332, other than that requiring an environmental im-

■ Thus, it is clear that we lack jurisdiction under the Federal Power Act to review the Commission's authorization of the border-crossing facilities at Fort Covington, New York. Petitioner has suggested that even though we lack jurisdiction under the Federal Power Act, the Administrative Procedure Act may provide jurisdiction in this case for the review of the order and Permit as "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. *See also* 5 U.S.C. § 702. This court does not appear to have decided the much debated question whether the Administrative Procedure Act (APA) confers jurisdiction for review of all final agency action. *See Aguayo v. Richardson,* 473 F.2d 1090, 1101–02 (2d Cir. 1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974). *Compare Bradley v. Weinberger,* 483 F.2d 410, 413 (1st Cir. 1973) (APA confers jurisdiction), *with Chaudoin v. Atkinson,* 494 F.2d 1323, 1328–29 (3d Cir. 1974) (APA does not confer jurisdiction), *and Bramblett v. Desobry,* 490 F.2d 405, 407 (6th Cir.) (same), *cert. denied,* 419 U.S. 872, 95 S.Ct. 133, 42 L.Ed.2d 111 (1974). Assuming, however, that the APA independently establishes jurisdiction for the review of agency action, we need only point out that such jurisdiction would lie originally in the district courts and not in the courts of appeals. *See Bradley v. Weinberger, supra; Rettinger v. FTC,* 392 F.2d 454, 457 (2d Cir. 1968). *See generally* Note, *Jurisdiction to Review Federal Agency Action: District Court or Court of Appeals,* 88 Harv.L.Rev. 980 *passim* (1975).[21]

Petition dismissed for lack of jurisdiction.

See Appendix A on next page.

pact statement. Our dismissal for lack of jurisdiction of this petition for review does not, of course, foreclose it from bringing action in the district court if it considers the argument meritorious, a matter on which we express no opinion. *See Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army,* 470 F.2d 289 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). Any such action would not lie, as a matter of first instance, in the court of appeals.