**NEW YORK STATE ELECTRIC & GAS CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Municipal Electric Utilities Association of New York State and Power Authority of the State of New York, Intervenors.**

**No. 1126, Docket 83–4010.**

United States Court of Appeals, Second Circuit.

Argued April 11, 1983.

Decided June 28, 1983.

Frederic H. Lawrence, New York City (Kenneth M. Jasinski, and Huber Lawrence & Abell, New York City, on the brief), for petitioner New York State Elec. & Gas Corp.

Joshua Z. Rokach, Atty., Washington, D.C. (Charles A. Moore, Gen. Counsel, and Barbara J. Weller, Deputy Sol., Washington, D.C., on the brief), for respondent F.E.R.C.

John W. Griggs, Washington, D.C. (Wallace L. Duncan, J. Cathy Lichtenberg, and Duncan, Weinberg & Miller, Washington, D.C., on the brief), for intervenor Municipal Elec. Utilities Ass'n of New York State.

Stephen L. Baum, Gerald C. Goldstein, Wendy M. Lane, and Michele P. Stine, New York City, submitted a brief for intervenor Power Authority of the State of N.Y.

Before FEINBERG, Chief Judge, TIMBERS and MESKILL, Circuit Judges.

TIMBERS, Circuit Judge:

Petitioner New York State Electric & Gas Corporation (NYSEG) transmits electric energy to intervenor Power Authority of the State of New York (PASNY). PASNY, in turn, sells power to, among others, intervenor Municipal Electric Utilities Association of New York (MEUA). The present controversy arose when NYSEG filed a revised rate schedule with respondent Federal Energy Regulatory Commission (FERC) to reflect new tax normalization procedures required by FERC in its June 4, 1982 order, reported at 19 F.E.R.C. ¶ 61,228 (1982). Intervenors challenged the new filing, claiming that NYSEG lacked the contractual power to charge a higher rate than that set by a prior contract between NYSEG and PASNY.

FERC upheld intervenors' objection to the compliance filing in an order dated September 30, 1982, reported at 20 F.E.R.C. ¶ 61,411 (1982). It held that the NYSEG–PASNY agreement barred the rate increase even though NYSEG had filed the higher rate in response to a FERC order. In its September 30, 1982 order, FERC consequently modified its June 4, 1982 order, holding that NYSEG could not charge a higher rate to reflect the changes brought about by compliance with the new tax accounting procedures.

NYSEG petitions to set aside the September 30, 1982 order, asserting that the order contravened well established principles of contract interpretation and rate-making jurisprudence. We disagree. We deny the petition and enforce FERC's order.

I.

The core of the dispute in this case is a letter agreement executed by NYSEG and PASNY dated February 3, 1982. According to that agreement, NYSEG agreed to provide electric transmission (wheeling) service for PASNY under the following rate guideline:

"Power Authority shall compensate NYSEG for the use of NYSEG's transmission facilities to effect the transmission and delivery of electric power and energy as provided hereunder at such rates as shall be approved by FERC. The rates initially filed or to be filed by NYSEG

with FERC shall be $2.85 per month per kilowatt of billing demand of the Power Authority's customers for deliveries beginning July 1, 1982. All billing demands shall be measured at such customers' point or points of delivery."

NYSEG filed the agreement with FERC on March 30, 1982, requesting an effective date of July 1, 1982 for collecting that rate from PASNY. In support of the $2.85 rate, NYSEG included a cost-of-service study as required by 18 C.F.R. § 35.13 (1982).

After FERC gave public notice of the filing, PASNY intervened in support of NYSEG's filing. MEUA, along with the New York State Rural Electric Cooperative Association, sought leave to intervene in order to challenge the proposed rate increase.[1] By an order dated June 4, 1982, FERC granted intervention, denied the motions to reject NYSEG's March 30, 1982 filing, accepted the proposed $2.85 rate for filing, and made the rate effective July 2, 1982. To determine the "reasonableness" of the filed rate, FERC ordered hearings to commence within the year, but, pursuant to 16 U.S.C. § 824e(a) (1976), it allowed the rate to be collected in the interim, subject to refund after the hearings. FERC also required NYSEG to revise its filing to reflect FERC's new tax accounting procedure under its recent Order No. 144–A, requiring normalization of tax timing differences for ratemaking. FERC Statutes and Regulations ¶ 30,340.[2] Apparently the revised rate was to go into effect upon filing without any further review. In conformity with the FERC order, NYSEG on July 2, 1982 submitted new cost statements with a revised rate of $3.13 per kw per month.

On August 2, 1982—31 days later— MEUA, a customer of PASNY, filed a motion to reject the revised $3.13 rate. It predicated its challenge on the *Mobile-Sierra* doctrine[3] which provides that a utility may not avoid a rate set by private contract through filing a rate hike with the Commission. In the absence of such a contractual bar, a utility under § 205 of the Federal Power Act, 16 U.S.C. § 824d (1976 & Supp. III 1979),[4] may file for a unilateral rate

---

1. MEUA alleged in part that NYSEG failed to file adequate supporting materials to back its request for the revised rate. It also claimed that the February 3 letter agreement violated New York State law because PASNY failed to hold public hearings and obtain gubernatorial approval before enacting the rate agreement as required by N.Y.Pub.Auth.Law § 1009 (McKinney 1982).

2. In its June 4, 1982 order, FERC also held that, insofar as intervenors raised state law objections to the filing, their remedy would lie in the state courts. Certain rural electric corporations did challenge the contract in the state courts on the ground that it violated N.Y.Pub.Auth.Law § 1009 (McKinney 1982). In a decision dated February 24, 1983, the New York State Supreme Court, Joseph S. Sedita, J., declared the PASNY–NYSEG contract invalid because of PASNY's failure to hold hearings and receive gubernatorial approval. *Delaware County Elec. Coop., Inc. v. PASNY*, 460 N.Y. S.2d 430 (Sup.Ct., Niagara Cty., 1983). Enforcement of that decision is stayed automatically pending appeal. N.Y.Civ.Prac.Law and Rules § 5519(a) (McKinney 1978). While the eventual result might affect the lawfulness of the underlying rate agreement, it has little bearing on the issues presented on the instant petition to review.

3. *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

4. Section 205, 16 U.S.C. § 824d, provides in pertinent part:
 "(a) All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

 . . . (c) Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

 (d) Unless the Commission otherwise orders, no change shall be made by any public

increase. The increase takes effect by operation of law after thirty days' notice to the Commission and the public, pending a full hearing on the lawfulness of the rate. The Commission may suspend the filed rate for a maximum five-month period after it otherwise would have become effective. Even in that situation, however, the suspension period may well expire before the end of the rate investigation, thus allowing the higher rate to be charged on an interim basis.[5] But under the *Mobile-Sierra* doctrine, a utility is bound by rates set by agreement with its customers; it cannot increase rates unilaterally, even in response to unforeseen economic developments, unless the Commission has concluded that the old rate is unjust and unreasonable. Thus, MEUA argued that the February 3, 1982 PASNY–NYSEG agreement precluded collection of the $3.13 rate until the increase received ultimate approval from FERC.

On August 17, 1982, PASNY joined MEUA's motion, asserting that NYSEG was barred from filing any rate higher than the original $2.85 rate under the terms of the February 3, 1982 agreement. NYSEG opposed the motion of PASNY and MEUA on the procedural ground that the motion should be dismissed as untimely and on the substantive ground that the intervenors misconstrued the relevance of the *Mobile-Sierra* doctrine as applied to the February 3 agreement.

After ruling that the motion to reject the filing was not untimely, FERC held that the February 3 letter agreement barred NYSEG from collecting the increased rate. It reinstated the $2.85 rate and ordered NYSEG to make refunds. NYSEG thereupon filed the instant petition to review.

## II.

■ NYSEG argues as a procedural matter that MEUA and PASNY failed to file their objections to the new rate on time. It relies on 16 U.S.C. § 825*l*(a) (1976) which provides that any party "aggrieved by an order issued by the Commission in a proceeding under this chapter ... may apply for a rehearing within thirty days after the issuance of such order." NYSEG asserts that, since FERC's order requiring it to file a revised rate was issued on June 4, 1982, MEUA's motion filed August 2, 1982 to reject the rate should be dismissed as untimely, since it was filed 29 days after the statutory deadline.

This argument, however, misconstrues the substance of the objections of MEUA and PASNY. Their motion to reject the revised rate did not stem from dissatisfac-

utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect.

(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint ... [to] suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effec-

tive. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified...."

5. The increased rate is still subject to refund if FERC determines after hearings that the proposed rate is unjust or unreasonable. Note 4 *supra*.

tion with FERC's order of June 4 requiring utilization of certain tax accounting procedures, but rather from dissatisfaction with the increased rate filed July 2, approximately one month later. At the time of the June 4 order, MEUA, PASNY, and apparently FERC itself did not realize that incorporating the tax normalization procedures would result in a higher rate. We do not understand NYSEG to suggest otherwise. MEUA therefore could object to the June 4 order only when it discovered its actual effect, namely, the increased rate. As the Court of Appeals for the District of Columbia Circuit recently stated in rejecting an argument similar to that urged by NYSEG, "It is one thing ... to require that good faith objections to projected effects of an *existing* rate proposal be raised at a particular time in [the] proceedings. It is quite another to suggest that a protest be made on potential effects of *hypothetical alterations* to the existing proposal." *Alabama Electric Cooperative, Inc. v. FERC,* 684 F.2d 20, 25 (D.C.Cir.1982) (emphasis in original). The timeliness of MEUA's objections therefore must be assessed from the date it discovered the rate increase. *Id.* at 26 ("timeliness of an objection, protest, complaint, or argument is to be judged ... *when* the issues themselves arise and call for a decision.") (emphasis in original).

In response, NYSEG urges that the objection still was untimely because 31 days, or one more than the statutory limit, elapsed between its July 2 filing and MEUA's motion to reject. We disagree. While NYSEG filed its revised rate on Friday, July 2, MEUA first received notice of the filing after the July 4 weekend, on July 6. Its motion to reject the revised wheeling rate was filed within the ensuing thirty day period. We hold that it was filed on time.[6]

Accordingly, we turn to the merits of FERC's disposition of the MEUA motion.

### III.

NYSEG characterizes FERC's September 30 order, prohibiting NYSEG from charging higher than the agreed upon $2.85 rate, as totally without basis in law. NYSEG claims, first, that FERC ignored the plain language of the February 3 letter agreement; second, that, even under FERC's reading of the contract, the rate increase should have been permitted because FERC had approved the revised rate; and, third, that the *Mobile-Sierra* doctrine applies only to unilateral rate increases, not to those imposed by a third party such as FERC in this case. We shall address each claim in turn.

█ Under the *Mobile-Sierra* doctrine, when a utility has contracted with its customers for a fixed rate, it may not utilize the procedures established in § 205 of the Federal Power Act to charge a higher rate. While a utility must abide by the provisions of a fixed rate contract, *United Gas Pipe Line Co. v. Mobile Gas Service Corp., supra,* 350 U.S. at 344; *FPC v. Sierra Pacific Power Co., supra,* 350 U.S. at 353, it also may enter into contracts that expressly reserve its right to apply for unilateral changes. *United Gas Pipe Line Co. v. Memphis Light, Gas and Water Division,* 358 U.S. 103, 110–11 (1958). FERC of course still must scrutinize any unilateral revision to ensure that the rate is "just and reasonable", 16 U.S.C. § 824d, but the utility may collect the higher rate in the interim. Note 4 *supra.*

NYSEG and FERC agree that the February 3 letter agreement embodied a modified *Mobile-Sierra* approach—the flat rate es-

---

**6.** Moreover, FERC previously has entertained technically "untimely" motions when there has been uncertainty as to the effect of a FERC order, as with the requirement to incorporate the tax normalization procedures in the instant case. *Virginia Elec. & Power Co.,* 20 F.E.R.C. ¶ 61,210 (1982). The "Commission's interpretation of its own regulations is 'of controlling

weight unless it is plainly erroneous.'" *Papago Tribal Utility Authority v. FERC,* 610 F.2d 914, 920 (D.C.Cir.1979) (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414 (1945)). We cannot say that FERC's decision to entertain MEUA's motion to reject was plainly erroneous.

tablished in the contract could be altered contingent upon FERC approval of the change. It is the nature of that contingency, however, that remains in dispute. MEUA and PASNY, together with FERC, contend that the contract permits an increased rate only upon final approval of the rate change by FERC, after all the requisite hearings. Consequently, they argue that the new rate cannot go into effect until after ultimate approval is obtained. On the other hand, NYSEG interprets the key contractual phrase "Power Authority shall compensate NYSEG ... at such rates as shall be approved by FERC" to permit a rate change whenever a revised rate is initially "accepted" by FERC. Under that reading, the utility would have the benefit of the higher rate upon submission of its request for an increase, at least until after hearings on the lawfulness of the proposed rate. NYSEG stresses that if PASNY wished to prevent interim rate hikes, it could have drafted the agreement to read "at such rates as shall be *ultimately* approved by FERC." The difference between the two interpretations may be critical because of the often lengthy delays between initial acceptance of a rate for filing and final approval.

■ We find FERC's interpretation to be more persuasive. The phrase "as shall be approved by FERC" appears to refer to the final approval process prescribed in 16 U.S.C. §§ 824d, 824e. Approval is a term of art which has been construed in the past by FERC's predecessor, the Federal Power Commission, to connote final approval as opposed to initial acceptance. For instance, in *Appalachian Power Co.*, 56 F.P.C. 2902 (1976), *order on reh'g*, 57 F.P.C. 1140 (1977), the pertinent clause of the contract provided that "any party may at any time ... unilaterally take any action ... that it deems desireable and in such event the terms and conditions under which service shall be rendered hereunder shall be the terms and conditions authorized by such authority." The FPC interpreted "author-

ized" just as it previously had interpreted "approved"—neither permitted "unilateral filing under Section 205 of the Federal Power Act." The utility could propose rate changes under the modified *Mobile-Sierra* contract, but the new rate could not go into effect prior to receiving ultimate approval from the Commission.

The Court of Appeals for the District of Columbia Circuit in *Papago Tribal Utility Authority v. FERC, supra* note 6, was confronted with a similar contractual provision. "The rates hereinabove set out ... are to remain in effect ... until changed by the Federal Power Commission." As in the instant case, the question for resolution was whether a rate increase could go into effect before ultimate approval by the Commission. In overturning first the decision of the FPC, and then that of its successor, FERC, to allow the utility to collect the higher rate, the court reasoned that the phrase "until changed by the Federal Power Commission" referred to final approval after the appropriate hearings. 610 F.2d at 927–28. *See also Louisiana Power & Light Co. v. FERC*, 587 F.2d 671, 675–76 (5 Cir.1979). Private contracts, therefore, which condition a utility's ability to make rate adjustments upon FERC approval should be read as allowing increased charges only after an adjudication of the reasonableness of the rate, and not just after FERC acceptance of the filing.

■ In the instant case, FERC interpreted the letter agreement to set a flat $2.85 rate, "and that no higher rate may be collected prior to a determination pursuant to either section 205 or 206 that the rate on file is unjust and unreasonable." FERC's construction of the contract follows the guidelines established in *Appalachian Power* and *Papago*. It appears to give effect to the intent of the parties. A contrary reading, allowing a rate hike to be collected upon "acceptance" would convert the clause "as shall be approved by FERC" into an empty formality. As long as the utility proffered the proper supporting materials

with its filing, it could collect the higher rate. We hold that the interpretation urged by FERC, the agency most familiar with the vagaries of electrical utility wheeling contracts, to be reasonable. NYSEG may charge rates higher than $2.85 only upon final approval of FERC.[7]

 NYSEG further contends that FERC in fact gave its final approval to the higher rate. If no material facts are in dispute, FERC may adjust rates without holding a hearing. *Municipal Light Boards of Reading and Wakefield Massachusetts v. FPC,* 450 F.2d 1341, 1345 (D.C.Cir.1971), *cert. denied,* 405 U.S. 989 (1972). Since the applicability of the tax normalization regulations is not contested, NYSEG claims that the June 4 order gave the requisite final approval for the rate hike.

The short response to NYSEG's contention is that the June 4 order did no such thing. In part of the order, FERC specifically stated that "[o]ur preliminary review of NYSEG's filing and the intervenors' pleadings indicates that the proposed rates have not been shown to be just and reasonable." It ordered hearings to determine the justness and reasonableness of the proposed rates. Accepting a rate for filing cannot be equated with final approval: "[a]n order by this Commission accepting for filing a rate increase filed pursuant to Section 205 is not an approval of such an increase by this Commission." *Indiana & Michigan Electric Co.,* 51 F.P.C. 1752, 1754 (1974), *aff'd per curiam,* 530 F.2d 1060 (D.C.Cir.1976). The June 4 order cannot be construed as granting final approval of the rate hike.

 NYSEG's final contention is that the *Mobile-Sierra* doctrine bars only unilateral increases in rates, not those imposed by order of FERC. True, FERC ordered NY-

SEG to make a compliance filing reflecting the tax normalization regulations. Under certain circumstances, a FERC order may well supersede the rate agreed upon by private contract. *United Gas Pipe Line Co. v. Mobile Service Corp., supra,* 350 U.S. at 341. Whether FERC lawfully could order the higher rate in the instant situation is a question we need not decide today. All that is before us for determination is the propriety of the September 30, 1982 order which modified FERC's prior order to ensure that NYSEG did not increase its rates.

The question here presented, therefore, is not the applicability of the *Mobile-Sierra* doctrine per se, but the reasonableness of FERC's decision not to allow the rate increase out of deference to the *Mobile-Sierra* doctrine. FERC assessed the equities of the situation and concluded that fidelity to the *Mobile-Sierra* doctrine outweighed any possible unfairness that arose from its prior order to utilize the tax normalization procedures. NYSEG may contest the continuing reasonableness of the rate in the hearings that presumably will ensue. We hold that FERC's action was not an abuse of discretion.

The petition to set aside FERC's order is denied; the order is enforced.

Enforced.

---

7. NYSEG urges us to consider extrinsic evidence of PASNY's intent regarding the contractual language. It relies on a letter dated July 8, 1982 sent by PASNY to the Village of Sherburne. NYSEG did not present this evidence to FERC. We therefore are precluded from considering it now. 16 U.S.C. § 825*l*(b). *Greene County Planning Board v. FPC,* 528 F.2d 38 (2 Cir.1975). In any event, the letter merely expresses PASNY's understanding of the June 4, 1982 order—that FERC ordered the compliance filing which led to the increased rate—not that PASNY agreed that such an increase was contemplated by the February 3 letter agreement.