The STATE OF MISSOURI ex rel. The MISSOURI–ST. LOUIS METROPOLI-TAN AIRPORT AUTHORITY, and Thomas F. Eagleton, United States Senator for Missouri, Plaintiffs,

v.

William T. COLEMAN, Jr., Secretary of Transportation of the United States, Defendant.

Civ. A. No. 76–1683.

United States District Court, District of Columbia.

Feb. 8, 1977.

Erwin N. Griswold, L. Welch Pogue, Peter B. Work, Suellen T. Keiner, Bruce J. Terris, Washington, D. C., for plaintiffs.

Irwin L. Schroeder, Gary B. Randall, Land and Natural Resources Div., Dept. of Justice, Washington, D. C., Elroy H. Wolff, Washington, D. C., Robert B. Donin, Dept. of Transp., Washington, D. C., for defendant.

AUBREY E. ROBINSON, Jr., District Judge.

## MEMORANDUM AND ORDER

The issue in this case is whether the Secretary of Transportation exceeded his statutory authority or acted arbitrarily and capriciously in approving on September 1, 1976, subject to a number of conditions and limitations, an application for federal funds to acquire land for an airport in the area of Columbia-Waterloo, Illinois. Plaintiffs and intervening plaintiffs include the State of Missouri, United States Senator Thomas F. Eagleton, the City of St. Louis, St. Louis, St. Charles, Jefferson and Franklin Counties, and numerous municipalities in Missouri (the "Missouri Parties").[1] Defendant and intervening defendant are Secretary of Transportation William T. Coleman, Jr. (the "Secretary") and the St. Louis Metropolitan Area Airport Authority ("SMAAA").

On November 17, 1976, this Court denied Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction and imposed a stay on discovery. The matter is presently before the Court on Defendants' Motion for Summary Judgment and on Plaintiffs' motions for Leave to Conduct Discovery and Deferral of Consideration of Defendants' Motion for Summary Judgment, Temporary Restraining Order, and Preliminary Injunction, and in Opposition to Defendants' Motion for Summary Judgment.

The Lambert-St. Louis International Airport, located in St. Louis County, Missouri, is currently the major air carrier airport for the St. Louis Metropolitan area. In 1968, the Federal Aviation Agency recognized, in the National Airport System Plan, the need for additional commercial aviation capacity beyond that provided by Lambert Field in order to adequately serve the St. Louis metropolitan area in the foreseeable future.

In 1970, the Illinois legislature created SMAAA to undertake airport development.

---

1. Complainants here also include an organizational intervening Plaintiff, HUSTLE, comprised of Illinois citizens protesting the Secretary's decision.

Later that year, the Illinois Authority announced that the Columbia-Waterloo site in Illinois was the preferred location for a new airport. In January 1972, the State of Illinois applied for federal funds to begin land acquisition near Columbia-Waterloo. During this period, the State of Missouri was studying various sites located in Missouri and in February, 1972, the State of Missouri created the Missouri-St. Louis Metropolitan Airport Authority to further examine the situation. In March 1972, while the Illinois project application was pending, former Secretary of Transportation John A. Volpe advised local authorities that an additional large airport was required for the St. Louis area and directed his Regional Representative to bring together the interested jurisdictions to agree upon a site. No agreement was reached.

In 1974, federal funds were awarded under the FAA's Planning Grant Program to Lambert Field authorities to conduct a master planning study of Lambert Airport to determine its potential to meet the region's future air carrier airport needs. The terms of the grant restricted examination of Lambert's future capacity to the year 1995. The first phases of this study, by the Ralph M. Parsons Company/Gruen Associates ("Parsons"), were completed in January 1975.[2] In order to compare the alternatives of remaining at an expanded Lambert Field or transferring to Columbia-Waterloo, the Department of Transportation commissioned a study by Peat, Marwick, Mitchell and Company ("PMM"), which was completed in November 1975. This study was restricted to an examination of Lambert's capacity up to the year 2000 with no consideration accorded replacement sites other than Columbia-Waterloo and with no consideration given to possible improvements in air traffic control technology and procedures.[3]

On January 13, 1976, Secretary Coleman held a public hearing in St. Louis to discuss the Illinois application for project assistance. At the public hearing, representatives of State and local government (including some of the plaintiffs here),[4] the business community civic groups and other elected officials and interested citizens addressed a series of issues relevant to the Illinois application. Written presentations were submitted to the public docket, which remained open until January 30, 1976. Each side was then given until February 9, 1976, to respond to the written submissions of the other side. After February 9, 1976, the Secretary received correspondence on the application, which became a part of the public file.

On September 1, 1976, Secretary Coleman released a Final Environmental Impact Statement. He also released a detailed written decision approving the Illinois application for a grant for land acquisition for a new major air carrier airport at the Columbia-Waterloo site.

Plaintiffs challenge the Secretary's decision on two general grounds, attacking the administrative procedure that produced the decision as well as the statutory base upon which the Secretary's actions are premised. Plaintiffs claim that the Secretary did not act upon a complete and proper administrative record and that his decision consequently is arbitrary and capricious. They contend that the basis of the Secretary's decision was limited by restrictions imposed upon the Lambert Field studies and by mistaken interpretations of the date which was available. Thus Plaintiffs ask that either they be allowed to conduct discovery in this

---

**2.** The Parsons Study concluded that Lambert could be expanded to meet the region's air carrier airport needs until at least 1995. However, the FAA expressed serious reservations regarding this conclusion because of the study's reliance upon future air traffic control technology advances.

**3.** The PMM Study concluded that it would be more sound economically to delay construction and operation of Columbia-Waterloo and to

remain for a time at an improved Lambert Field; the study also concluded that the "most likely" level of operations could be accommodated at an improved Lambert, but with increasing congestion over time.

**4.** Nowhere do Plaintiffs contend that they were denied the opportunity to be heard at this hearing.

litigation to explicate these alleged gaps in the administrative record, or in the alternative that the matter be remanded to the Secretary in order that he might reconsider his decision in light of these alleged deficiencies in the record.

Plaintiffs also contend that the Secretary disregarded a series of statutory and regulatory provisions which Plaintiffs say are designed to ensure consideration of, and in some instances, deference to local views on airport matters. Plaintiffs assert that the Secretary's actions are violative of the Airport and Airway Development Act of 1970, as amended (the "ADAP Act"),[5] the National Environmental Policy Act ("NEPA")[6] and Office of Management and Budget Circular A–95 ("OMB Circular A–95").[7] Relying upon these contentions Plaintiffs ask for a preliminary injunction staying the Secretary's decisions and for Summary Judgment in their favor.

Defendants respond to the arguments of Plaintiffs by contending that mere disagreement with the Secretary's decision is insufficient to invalidate that decision; that the record upon which the Secretary's decision is based is complete and sufficient to support the Secretary's judgment; that the actions of the Secretary cannot be termed arbitrary and capricious; that the Secretary acted within his statutory authority in approving the Illinois application; and that there exists no genuine issue of material fact which would preclude the Court from granting summary judgment in favor of the Defendants. For the reasons discussed below, this Court agrees with Defendant's position.

■ It is important to the resolution of the issues posed in this litigation to set out the scope of review under which the Court must decide the issues. Simply stated, the standard of review as set forth in the Administrative Procedure Act 5 U.S.C.

§ 706(2)(A)(1970), requires that the " . . . reviewing court shall—

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . "

To sustain administrative action reviewable under this standard requires a finding that the choice made was not arbitrary, capricious, or an abuse of discretion. To make this finding the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens Committee to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ The standard of arbitrary and capricious does not license the Court to embark upon wide ranging searches for "clear errors of judgment," *Ethyl Corp. v. EPA,* 541 F.2d 1 at 35 n. 74 (D.C.D.C.1976). It is in fact an extremely narrow standard, considerably narrower than the "substantial evidence" test. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 143, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). See *Ethyl Corp. v. EPA, supra,* for the proposition that *Overton Park* reaffirmed the standard of review.

Plaintiffs allege that in reaching his decision, the Secretary failed to consider various factors and failed to study the questions of alternative site selection, airport noise and the problem of general aviation traffic. Additionally, it is claimed that there might have been improper influence on the part of an FAA official with regard to a site selection study then being conducted. The effect of all this, the Missouri parties contend, was to predetermine the decision before the Secretary acted on Illinois' request for funds. Essentially, Plaintiffs claim that the record was "distorted" and was therefore an inappropriate basis for a decision.

---

5. 49 U.S.C. § 1701, et seq.

6. 42 U.S.C. § 4321, et seq.

7. OMB Circular A–95 requires local and environmental review of major substantive changes

in proposals for federal funds. OMB Circular A–95 was promulgated in accord with the Intergovernmental Cooperation Act of 1968, 42 U.S.C. §§ 4231, 4233 (1970).

The Missouri parties request that discovery be allowed as to these matters so that a "thorough, probing, in-depth" review of the Secretary's decision may be accomplished by the Court.

The Missouri parties' position does not comport with existing case law on the subject. The record to be reviewed by this Court is the record that was before the agency. This Court has no authority to make an "administrative record." *Camp v. Pitts,* 411 U.S. 138 at 142, 93 S.Ct. 1241, 36 L.Ed.2d 106, *Overton Park v. Volpe, supra, Bradley v. Weinberger,* 483 F.2d 410 at 413 (1st Cir. 1973) (1973), *Texas v. EPA,* 499 F.2d 289, 297 (5th Cir. 1974).[8]

Plaintiffs' reliance upon *Overton Park, supra,* to support their discovery claims is misplaced. The statutes[9] in issue there prohibited the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if a feasible and prudent[10] alternative route existed. The Secretary announced that he concurred in the judgment of local officials that the highway should be built through Overton Park, but made no statement of formal findings. Although such formal findings were not required by the Court, it did state that "judicial review based solely on litigation affidavits"[11] was inadequate. The Court stated that there was an administrative record that allowed full, prompt review but that the record was not before the Court. The Supreme Court remanded the case to the District Court for a review "based on the full administrative record that was before the Secretary."[12] The Supreme Court then stated that "since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation."[13] The Court then indicated that testimony may be necessary but citing *U. S. v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) admonished that such inquiry into the mental process of decisionmakers is usually to be avoided.[14] Thus it is clear that in *Overton Park* discovery was allowed only as an expedient[15] in sharply limited[16] situations. Further, even in *Overton Park* discovery was not required.[17]

The Court of Appeals for this Circuit has recently addressed this same point. In *Do-*

8. The Missouri parties cite several other cases which they claim support discovery where administrative orders are being challenged. The short answer to this is that each of those cases are distinguishable or on close analysis supports the denial of discovery. The cases principally relied on by Plaintiffs are *NAACP, Western Region v. Hodgson,* 57 F.R.D. 81 (D.C.D.C. 1972), which did not involve judicial review of agency action but a challenge to allege discriminatory conduct by the agency in violation of the Civil Rights Act of 1964 (42 U.S.C. § 2000d). *Smith v. Schlesinger,* 168 U.S.App. D.C. 204, 513 F.2d 462, 473 (1975) permitting in camera inspection of investigative file which might show plaintiff's dismissal was on the basis of disloyalty and not mental illness, and *Nolen v. Schlesinger,* 492 F.2d 787, 788 (5th Cir. 1974), where the Court found that "de novo" review was appropriate.

9. The case was concerned with § 4(f) of the Department of Transportation Act of 1966, as amended, 49 U.S.C. § 1653(f) and § 18 of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138.

10. 401 U.S. at 409, 91 S.Ct. at 820.

11. 401 U.S. at 420, 91 S.Ct. at 825.

12. 401 U.S. at 420, 91 S.Ct. at 825.

13. Id.

14. It is worth noting here that Morgan as well as Overton Park abjures delving into the mental processes of the administrator without a strong showing of bad faith or other extreme circumstances. *National Nutritional Foods Association v. FDA,* 491 F.2d 1141 (2d Cir. 1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975); *South Terminal Corporation v. FPA,* 504 F.2d 646, 675 (1st Cir. 1974). Suffice to say that plaintiffs' allegation of improper influence by an FAA official, based largely on news accounts, falls short of the required showing.

15. 401 U.S. 420, n. 34, 91 S.Ct. 814 and separate opinion of Mr. Justice Black, 401 U.S. 421-22, 91 S.Ct. 814.

16. 401 U.S. at 420, 91 S.Ct. 814.

17. Id.

*raiswamy v. Secretary of Labor,* (No. 74–1847, decided November 26, 1976),[18] the appellants' claimed that the District Court erred in denying them discovery and therefore the opportunity of proving the unavailability of qualified American workers to fill the position openings in question. There the Court of Appeals, citing the *Overton Park* and *Camp* decisions, held that the District Courts were correct in restricting review to the record as made before the Secretary.[19] The Court went on to say that while there may be times where an agency may be called on "to more adequately explain . . . the reasons for its decision,"[20] that occasion arises only when "the bare record does not disclose the factors . . . considered or the Secretary's construction of the evidence."[21]

The Court then concluded "there is no occasion for a judicial probe beyond the confines of an administrative record" affording enough "contemporaneous explanation" of the administrative decision to indicate the determinative reason for the final action taken.[22]

■ Plaintiffs have asked this Court to enjoin the disbursements of funds for land acquisition in the Columbia-Waterloo area. The standard upon which this Court must judge a motion for preliminary injunction is that established by the Court of Appeals for the District of Columbia in *Virginia Petroleum Jobbers Association v. FPC,* 104 U.S. App.D.C. 106, 259 F.2d 921, 925 (1958) and reaffirmed in subsequent cases: has there been a strong showing that petitioner is likely to prevail on the merits; has there been a showing of irreparable injury without the requested relief; would the issuance of a stay substantially harm other parties interested in the proceedings; where lies the public interest. In order to prevail, a Plaintiff must convince the Court on each of the four criteria. For reasons hereafter set forth Plaintiffs have failed to demonstrate any likelihood of success on the merits. This Court is satisfied that the Secretary acted neither arbitrarily and capriciously nor outside the ambit of his statutory authority in approving the Illinois application. Accordingly, Plaintiffs' petition for preliminary relief must be denied.

The Missouri parties' claims with respect to the pending summary judgment motions may be summarized as follows: that the Secretary exceeded the authority granted him by Congress pursuant to Section 16(f)(1) of the ADAP Act (49 U.S.C. § 1716(f)(1)) in approving the application of the Illinois authority; that he failed to give fair consideration to the interest of communities near the proposed location of the project as required by the Section 16(c)(3) of the Act (49 U.S.C. § 1716(c)(3)); that the Secretary, by granting the requested funds for acquisition of the land, is engaging in the practice of "land banking" outside the scope of his authority; that he could not find that there were no "feasible and prudent" alternatives to the proposed site as required by Section 16(c)(4), 49 U.S.C. § 1716(c)(4), because he failed to study alternatives, and that the Environmental Impact Statement was inadequate and had to be recirculated under the mandate of OMB Circular A–95 and the National Environmental Protection Act.

■ The Airport and Airway Development Act of 1970, P.L. 91–258, (49 U.S.C. § 1701, et seq.), was enacted to provide for the expansion and improvement of the Na-

---

18. Doraiswamy was consolidated on appeal with *Honeywell Information Systems, Inc., et al. v. Secretary Labor,* No. 74–2017. In those cases the appellants challenged the determination of the Secretary made pursuant to Section 212(a)(14) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(14) (1970). This section bars aliens from entering the United States to perform labor unless the Secretary certifies that qualified American workers are not available.

19. Slip Opinion page 13.

20. Id. at page 20.

21. Id.

22. Id. at page 20 quoting *Camp v. Pitts,* 411 U.S. at 143, 93 S.Ct. 1241.

tion's airports.[23] The Act reflects, in part, a recognition of the rapid growth, with the attendant problems and benefits, of the action's air transportation system and its impact on the Nation's commerce.[24] The Act contemplates that the expansion of the air transportation system will be accomplished through a series of planning grants [25] and it requires also that air transport policy be integrated into a national transportation policy.[26] The Secretary and this Court are controlled by this legislation.

■ The Missouri parties claim that with respect to a site for additional airport facilities, Section 16(f)(1) of the ADAP Act limits the Secretary to nothing more than facilitating the agreement of the governing authorities of the areas concerned. They read the statute as precluding his consideration of the Illinois application because that application is opposed by the State and local governments in Missouri and agreement between those governing authorities as to site is impossible. But the provision of the statute when read literally and in context contains no such proscription.

The legislative debates concerning the Secretary's authority to determine the location for new airport facilities did not focus on the fact situation presented in this case. Those debates dealt with the situation in which no local governing authority in a metropolitan area sought to sponsor an application for a new facility.[27] In that event, the Secretary is without authority to determine the site, he could not impose an airport upon a metropolitan area where there was no sponsor, he could not act as a "federal Czar." There is no mention or suggestion in those debates that the Secretary

could not consider an application from a proper local authority in a metropolitan area unless all other governmental authorities in the area were in agreement as to the location.

When Congress intended to give a local or State authority virtual veto power over the development for an airport in its area it did so specifically. With respect to the development of non-metropolitan airports, Section 16(f)(2) expressly provides for local veto. It did not so provide with respect to metropolitan area airports.

■ The Missouri parties next contend that the Secretary failed to give "fair consideration" to local views as required by Section 16(c)(3) of the ADAP Act. Plaintiffs contend that the Secretary obviously did not give "fair consideration" to local views since implicit in his decision is a rejection of what Plaintiffs deem a "local consensus" [28] that Lambert should be developed as the area primary air carrier. Clearly, the views of those affected must be weighed. A brief look at the decision as well as the record supports the determination that local views were considered in the Secretary's decision.[29] The law requires that local interests be considered, not that they be decisive.

■ The Missouri parties also contend that the Secretary exceeded his authority in granting the funds for land acquisition since this constitutes "land banking" which is prohibited under the ADAP Act.

It appears to the Court that what the Missouri parties overlook is the explicit authority in the Act to the contrary. The Act specifically authorizes the acquisition of

---

**23.** U.S. Code Congressional and Administrative News, 91st Cong., 2d Session (1970) p. 3047.

**24.** Id. at 3051.

**25.** Id. at 3056.

**26.** Id. at 3055.

**27.** *See generally,* 115 Cong.Rec. 33260–33313 (1969), 116 Cong.Rec. 4868–4870; 5034–5045 (1970).

**28.** Plaintiffs contend that 80% of the affected population are opposed to the transfer of air carrier operations to Columbia-Waterloo.

**29.** We note that in holding the public hearing in St. Louis the Secretary went beyond what was required. Plaintiffs contention that "fair consideration" was not accorded the Missouri parties because there was no rational basis on which the Secretary could conclude, as he did, that Lambert could not be developed and that noise was a compelling argument for transfer will be developed later in this opinion.

land that is necessary for "future airport development," Section 11(2)(B), 49 U.S.C. § 1711(2). The Act permits advance purchase of land for future development when it is necessary to permit "any work involved in constructing . . . a public airport or portion thereof." Section 11(2).

The Act gives the Secretary the authorization to fund land acquisition for future airport development. The Secretary was not therefore engaged in land-banking.

■ Plaintiffs also argue that regardless of the Secretary's authority under the Act, the Secretary's failure to study certain aspects of the airport problem [30] and his misinterpretation of the conclusion of the studies that were done [31] require, at the very least, a remand to the Secretary for examination and redetermination. The short answer to Plaintiffs' contentions is that it is the administrative agency, not the Court, which is designed to have and does have the experience and expertise to implement national transportation policies; and it is the Administrator who determines how these resources are utilized in making his judgments. It is for the Secretary to decide what available studies and reports to consider and it is for him to decide whether to commission independent studies. *Market Street Railway Co. v. Railroad Commission of California,* 324 U.S. 548, 560, 65 S.Ct. 770, 89 L.Ed. 1171 (1945); *Consumers Union of United States, Inc. v. Consumer Product Safety Commission,* 491 F.2d 810, 812 (2 Cir. 1974). In addition, this Court is guided by the admonition expressed by the Court of Appeals for this Circuit in *Braniff Airways, Inc. v. CAB,* 126 U.S.App.D.C. 399, 379 F.2d 453, 463 (1967):

> Particularly in a comparative proceeding we must be chary of substituting our own evaluation for that of the Board, for in these circumstances the problem of the Board is often "not so much one of the resolving factual issues as of exercising its judgment." [32] (citations omitted)

■ Further, the record in this case makes it clear that the Secretary did consider the various factors and problems which the Plaintiff say were not studied, and the record supports the Secretary's determination in each instance. Site selection alternatives were placed before the Secretary and weighed by him.[33] The Secretary

---

**30.** Plaintiffs point to three areas here, arguing that questions regarding alternative sites, moving general aviation from Lambert Field, and coming advances in Air Traffic Control Technology were not studied. Plaintiffs account for these omissions by identifying several restrictions on the Parsons and PMM studies, which, Plaintiffs say, prevented the Secretary from giving fair consideration to local interests and from ascertaining that Missouri alternatives existed to the Columbia-Waterloo site. The restrictions Plaintiffs complain of are:

1. Both consultants were required to confine their studies of Lambert approximately to its present boundaries.

2. Parsons was limited to forecasting Lambert's future only to 1995, although the objective of the Master Plan was to determine Lambert's ultimate capacity.

3. PMM was required to assume a transfer of air carrier operations from Lambert between 1985 to 2000.

4. Neither consultant was authorized to study whether general aviation could be accommodated conveniently at other times or at other facilities other than Lambert's air carrier runways.

5. PMM was required to assume no improvement in air traffic control (ATC) technology through the end of the next twenty-five years.

6. PMM was required to assume only limited progress in noise abatement control through the end of the Century.

Defendants call these restrictions reasonable assumptions which must underlie any technical or scientific analysis. This Court has been presented with no authorities which would allow the Court to dispute Defendants' position.

**31.** See Secretary's decision (supra, at 26–27). Plaintiffs point here particularly to issues of aviation noise and air carrier delay.

**32.** This Court is aware that the decision in *Braniff,* supra, ultimately involved a detailed exploration into and a departure from the administrative pronouncements at issue there. The situation in the case at hand is inapposite to that in the *Braniff* case. The present facts more closely approach the facts in *Frontier Airlines, Inc. v. CAB,* 104 U.S.App.D.C. 78, 259 F.2d 808, 810 (1953), where the circuit Court of Appeals upheld the actions of the agency.

**33.** The Missouri parties contend that despite the Secretary's assertion "that full consideration has been given to alternative sites and no

devoted attention to questions of general aviation [34] and future Air Traffic Control Technology.[35] The aviation noise [36] and de-lay estimate [37] analyses which the Secretary performed are adequately detailed in the decision.

other site provides a feasible and prudent alternative" (Secretary's decision at 14–15), there is no evidence that the FAA or any FAA consultant ever investigated alternative sites. The fact is that alternative sites were examined by various consultants, including consultants employed by the Missouri parties (other studies done in connection with site selection involved Horner & Shifrin, Inc. in August 1969; R. Dixon Spears in November 1971; Northrop Corporation in 1970). The findings of these consultants did go before the Secretary. The Secretary considered a variety of alternatives, including (1) no new airport development; (2) various possible sites in Missouri and Illinois; (3) a major expansion of Lambert Field. See, for e.g., Environmental Impact Statement, pp. 4–1 to 4–67; Secretary's decision at 52–53.

**34.** Plaintiffs also take issue with the Secretary's treatment of the question of general aviation. Plaintiffs argue that Lambert could handle future air traffic demand by switching general aviation traffic to non-peak hours or to other facilities. The Missouri parties contend that since other consultants were not permitted to study the general aviation issue and since the issue was not studied by DOT, the Secretary's decision cannot stand. However, there was evidence in the record that while general aviation tends to leave as the airport becomes congested, there is certain level of general aviation at Lambert that would not leave. The record also indicates that the number and type of other facilities in the area made it speculative whether there is enough capacity in the area to handle the general aviation traffic that would be displaced from Lambert. The question of general aviation was considered. The Secretary had evidence from many sources as well as the experience and expertise inherent in the Department.

**35.** The Secretary referred in his decision to the fact that it is the policy of the FAA not to include potential technological advances in Air Traffic Control in estimates of future airport capacity for today's airport decisions (Secretary's decision at 45). While the Missouri parties contest this position, they point to nothing to refute it. They point to no law which requires an administrator to take future technology into account when arriving at a decision. Further, the Secretary does make explicit reference to new technology in his decision (Secretary's decision at 44–45). It is clear that the Secretary had before him information concerning the new technologies and an analysis of their impact (see for e.g. the Parsons Study).

**36.** The Missouri parties next challenge the Secretary's determination that the lessened impact of aviation noise promised by the Columbia-Waterloo alternative was a compelling argument for transfer. Plaintiffs observe that the PMM Study was required to assume that the only action likely to be taken over the next twenty-five years in the area of noise abatement was an engine retrofit program (which consists primarily of packing sound-absorbing material around the engines of the jets), and yet forty days after the decision the Secretary promulgated a new federal noise abatement program which goes considerably beyond the retrofit program. Plaintiffs also point to new operational procedures being implemented which will reduce noise even further (such as minimum flap setting use and EPA noise control program proposals). The Plaintiffs contend that the new initiatives will significantly diminish the impact of aviation noise and that the Secretary's noise analysis should be re-examined to see if noise still is a "compelling argument" for developing a new airport. The PMM report assumed that all aircraft would meet the standards published in FAA regulations, Part 36. It also assumed a retrofit program which would "quiet" pre-FAR 36 aircraft and the use of a straight-in 3° glide slope for all aircraft approaches (PMM Study, p. 26). The Aviation Noise Abatement Policy, however, only requires that the engines comply with FAR 36. The Plaintiffs argue that the new policy contemplates other techniques such as the two-stage approach, the use of minimum flap settings and power cutbacks on takeoff. As the Defendants point out, the use of the two stage approach and power cutbacks were specifically rejected by the FAA. (41 Fed.Reg. 52388–402, Nov. 29, 1976). As to minimum flap settings, the Secretary determined that minimum flap settings play an insignificant role in reducing aircraft noise.

**37.** Plaintiffs also attack the Secretary's estimates of delays at Lambert. Plaintiffs state that the Secretary's figure of 6.1 minutes for the year 2000 is derived from PMM's analysis, which was restricted in its assumptions relating to technological improvements. Plaintiffs contend that the FAA itself contemplates that new technology will be implemented in the 1980s and will significantly reduce delay time. However, in his decision the Secretary adopted the Plaintiffs' argument that new technology would reduce delays. Nevertheless the Secretary observed that only if the most optimistic predictions for improvements in air traffic control were realized would the delays at Lambert be near the level of today. (Secretary's decision at 48).

This Court cannot substitute its judgment for that of the Secretary. The Court cannot say on the basis of the record here that the Secretary's actions in arriving at the decision to approve the Illinois application were arbitrary and capricious.

There is one final issue. The Missouri parties allege that the Secretary has failed to comply with the requirements of local and environmental review imposed by the ADAP Act, NEPA and OMB Circular A–95. In 1971 Illinois submitted its initial proposal and a draft Environmental Impact Statement to the designated local clearinghouse agency (East-West Gateway Coordinating Council) as required by Circular A–95. The Clearinghouse agency passed the project along, with the comments received, to the Secretary. In 1976, in light of reduced traffic forecasts, Illinois outlined to the Secretary what is now the present proposal. This proposal has reduced the size of the terminal and eliminated a third runway. The Missouri parties contend that this reduced plan must be resubmitted for local review under the authority of OMB Circular A–95 and that the EIS should, because of these changes be required to go through A–95 review.

■ A–95 is a notice provision; it requires that any agency applying for assistance must notify the State and areawide planning clearinghouse of the intent to apply for assistance.[38] There is nothing in the guidelines which require recirculation of a proposal once this has been accomplished, as was accomplished here in 1971. There is no claim that there was insufficient review of the proposal during its circulation in 1971. Under OMB Circular A–95, this is all that is required.

Nor was it required that the revised EIS be taken through the A–95 review. First, the Court cannot find that these are major changes requiring re-review. Second, the circular provides only that local governments be informed of and given the opportunity to review and comment on the environmental significance of proposed projects.[39] Neither NEPA nor the A–95 Circular can be read to mandate another review cycle before the Secretary can consider the application.

The Plaintiffs' last attack is directed to the adequacy of the Environmental Impact Statement under NEPA standards. Plaintiffs raise two issues. First, Plaintiffs say that EIS misstates a crucial fact when it concludes that no additional highway development would be necessary to serve Columbia-Waterloo since planned highway construction will be undertaken whether or not the airport is built. Second, Plaintiffs point out that in the final EIS, a large number of environmental issues which plaintiffs deem crucial were deferred until the master planning stage and that the EIS fails to properly explore the socio-economic impact of development on Illinois or of the abandonment of Lambert Field on St. Louis. Thus Plaintiffs say that this list of deferred environmental questions makes it clear that the "final" EIS cannot be a complete evaluation of the whole project, and therefore the EIS is inadequate.

■ The Secretary found that the basic highway system would be constructed with or without the development of the Columbia-Waterloo airport. The record clearly supports this determination.[40] It is also clear from the EIS (Vol. 1, pp. 2–109 to 2–113) that studies conducted put the cost of highway expansion at substantially below what Plaintiffs claim will be needed. The Court cannot conclude that the EIS suffers from any mis-statement of fact that would serve to invalidate the statement.

■ As to the second issue, Plaintiffs apparently want a deferral of the decision until all the information on every conceivable issue is collected and before the

**38.** *See generally* Circular A–95, Office of Management and Budget, February, 1971. Particularly Part 1, Section 2 and Part 4.

**39.** Id.

**40.** Secretary's decision p. 20. The calculations were adopted from the local clearinghouse agency study of the highway system.

 

Secretary. It is quite true that certain issues were deferred, but what must be kept in focus is that what the Secretary had before him was an application for funds to acquire land. NEPA is not a straightjacket. The Courts have recognized that the statute admits of some flexibility and discretion in determining the contents of impact statements. *Scientist Institute for Public Information, Inc. v. AEC,* 156 U.S. App.D.C. 395, 481 F.2d 1079 (1973). It is obvious that the environmental review is not complete. There will be time for further environmental consideration while it can still have an impact. It appears that in all areas of the EIS the agency took more than the "hard look" [41] at the environmental consequences that is required by NEPA. There is no doubt that the EIS is sufficient in all respects.

From what has been developed it is clear that there is no basis for remanding the case to the agency for a redetermination of the issues raised by the Plaintiffs. Likewise there is no basis for holding the decision of the Secretary arbitrary and capricious.

The Missouri parties speak of a "formlessness" of the proceedings leading to the Secretary's decision, a formlessness which has destroyed the fairness of the proceedings and precluded them from making an unbiased record. It is apparent that this has not been the case. The Plaintiffs were not prevented from submitting any document or study which would support their claim. Indeed they had years in which to act. The Secretary considered all that was before him and went beyond what was required of him in deciding this issue. There can be no doubt that while the Plaintiffs may disagree with the decision that was reached they have presented to this Court nothing from which it can be legally determined that it was improper under the existing statutory and case law.

### ORDER

Upon consideration of Plaintiffs' Motions for Reconsideration of the Court's Order Staying Discovery or, in the alternative, for Remand to the Secretary, or for Summary Judgment and upon Defendant's Motion for Summary Judgment; it is by the Court this 8th day of February, 1977,

ORDERED that the Plaintiffs' Motions be and are hereby DENIED; and it is

FURTHER ORDERED that the Defendant's Motion for Summary Judgment be and it hereby is GRANTED.

---

41. *Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827 (1972).